KENNETH S. HIXSON, Judge
Appellant Eric Jamar Carter appeals after he was convicted by a Hot Spring County Circuit Court jury of rape and was sentenced as a habitual offender to serve a total of 480 months' imprisonment. On appeal, appellant contends that (1) the trial court erred by denying his motion for directed verdict; (2) the trial court erred in *791 admitting evidence of prior rapes that he was alleged to have committed pursuant to Arkansas Rule of Evidence 404(b) (2017); and (3) the trial court erred in denying his motion for mistrial after the prosecutor spoke to members of the jury during a trial break. We affirm appellant's conviction but remand to the trial court with instructions to correct the sentencing order.
I. Relevant Facts
In summary, appellant was charged and subsequently convicted as a habitual offender for raping T.S., a thirty-one-year-old woman with learning disabilities and characteristics of autism spectrum disorder, in violation of Arkansas Code Annotated section 5-14-103 (Supp. 2017). Appellant had previously lived at T.S.'s address before she had moved to that address from Alaska. On April 20, 2016, appellant went to T.S.'s home around midnight, and she invited him inside. After she asked him to leave, he refused. He pinned T.S. to the sofa and held her arms behind her back as she yelled for him to leave. While he held her down over the sofa, appellant penetrated T.S.'s vagina from behind with his fingers and then his penis. T.S. additionally sustained an injury to her shoulder, and there was a bite mark on her right breast. T.S. subsequently reported the incident to police after her mother came from Alaska to check on her in June 2016.
Before trial, the State filed a preliminary motion to determine the admissibility of testimony regarding two other rapes that appellant had allegedly committed in a similar manner. The State alleged that the testimony was admissible under Arkansas Rule of Evidence 404(b) as it was introduced as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Appellant filed a response alleging that the evidence was irrelevant, that the probative value was substantially outweighed by the danger of unfair prejudice, and that the alleged rapes were too separated in time, making them unduly remote and therefore inadmissible. A hearing was held on June 26, 2017.
At the hearing, H.W. testified that appellant approached her on the evening of March 11, 2014, when she was walking home from work in Malvern, Arkansas. She had stopped to rest on the church steps because she was ill with bronchitis. Appellant demanded that she come with him, and when she refused, he grabbed her by the arm and forced her down the steps with him. H.W. explained that appellant dragged her across the street to a row of houses. At one point, appellant allowed her to answer her phone when one of her friends, Laycon Clark, called her. She was able to provide Clark with some detail to be able to find where she was by lying to appellant that she was giving her friend directions to someone else's home. Appellant subsequently took her into the mud room of one of the houses, pinned her against the wall, and penetrated her vagina with his fingers. After he pulled out a knife and warned her not to try anything, he released her arm and penetrated her vagina with his fingers a second time. When H.W. recognized Clark's vehicle passing by the house, she kicked appellant in the groin and escaped. H.W. testified that she waited until the next day to report the incident to law enforcement.
Breanna Turner and Laycon Clark testified that they were H.W.'s coworkers and that they were looking for H.W. on the night of the incident. Turner explained that when she was driving home after work, she saw H.W. walking home. Although Turner attempted to get her attention, she was unable to do so. Instead, she called Clark to see if Clark had H.W.'s *792 phone number so that she could offer H.W. a ride home. Later, Turner met up with Clark, and they both started driving around to find H.W. Clark testified that she eventually was able to reach H.W. on the phone. Thereafter, she was able to find H.W., and H.W. ran and jumped into her car. Clark observed that H.W. was breathing heavily and was very upset.
Lieutenant Dorata Delacruz testified that he had participated in the investigation after H.W. reported the incident to law enforcement. Based on H.W.'s description of the man, law enforcement prepared a photograph lineup of six individuals, one of them being appellant. H.W. identified appellant as the man who had assaulted her. Lieutenant Delacruz testified that there were reports that H.W. occasionally had episodes of sleepwalking; however, H.W. testified that she was not asleep during her encounter with appellant. Lieutenant Delacruz further testified that he had interviewed appellant during the investigation. The video of that interview was played for the court and admitted into evidence.
During that interview, appellant denied the allegations. At first, appellant told Lieutenant Delacruz that he did not see any girl on the night of the incident while he was exercising and walking in the area where the alleged incident had occurred. Later, however, appellant admitted that he saw a girl in a car who was looking for a friend. After he subsequently saw another girl during his walk, he told the second girl that he thought someone was looking for her. He further explained that the second girl walked behind him and had a conversation with him for a little bit. He denied grabbing the second girl and instead claimed that she ran off after he told her that he thought the people in the car and the police were looking for her.
C.R. testified that she had reported to law enforcement that she had been raped by appellant in April 2014. She has an eye disease, keratoconus, and is unable to see very well. On the night of the incident, C.R. was at her apartment with her boyfriend, Tommy White, and her three children, who were asleep. Appellant, identifying himself as "Lazy," had walked down the street and started a conversation with them. Eventually, C.R. and White invited appellant inside. After thirty or forty-five minutes, White left to go to the store to buy cigarettes, and appellant left at the same time and started walking away. A few minutes later, C.R. answered the door after she heard a knock. C.R. testified that appellant was at the door. Although she told appellant to leave, appellant refused to do so and entered the apartment. Eventually, appellant pushed C.R. and pinned her down and bent her over onto a television stand. He pulled her pajama pants down and proceeded to rape her by first sticking his fingers and then his penis into her vagina. He fled the apartment when White's headlights appeared in the front window. Subsequently, appellant returned to the apartment, and White struck appellant with a flashlight. C.R. reported the incident to law enforcement the next morning. She admitted that she did not call law enforcement the night of the incident because they had been using drugs that night.
White testified at the hearing and corroborated C.R.'s version of events. Furthermore, Trooper Kyle Sheldon and Sergeant Frazier Ford testified that they had investigated the incident after it was reported. Sergeant Ford testified that he had previously heard the nickname "Lazy" being associated with appellant. He presented a photograph lineup, and both White and C.R. identified appellant.
*793 Jessica Jackson, one of C.R.'s neighbors and appellant's cousin, testified that she did not believe C.R. had been raped. Her stories to law enforcement and to the court were inconsistent as to the noises she heard from C.R.'s apartment.
After the hearing, the trial court filed a written order granting the State's motion and ruling that the evidence was admissible. In relevant part, the trial court made the following findings:
1. Witness H.W. testified to an incident during which a person she later identified as Eric Carter forced her to walk with him, led her to a dark alcove of an unoccupied house and forcibly put his hands down her clothing and into her vagina. Other witnesses including L.C. and B.T. as well as Dorata Delacruz of the Malvern Police Department testified to other circumstances surrounding the event and the criminal investigation.
2. Witness C.R. testified to an incident during which a person she later identified as Eric Carter forcibly raped her in her apartment a short time after she and her boyfriend, T.W. met him. T.W. and J.B. testified to other circumstances surrounding the event and Officer Frazier Ford of the Malvern Police Department and Trooper Kyle Sheldon of the Arkansas State Police testified to the criminal investigation.
3. The Court finds that the events described by the above witnesses are sufficiently similar to the allegations raised by T.S. in the case in chief to make their testimony relevant pursuant to Rule 404(b) and that their testimony will be admissible at the trial of the Defendant and may be used to establish the Defendant's intent, motive, opportunity, preparation, or plan in the rape of T.S.
4. The Court further finds that the State's Motion to Admit Evidence under Rule 404(b) pertaining to H.W. and C.R. is granted and that the Defendant's motion to exclude the 404(b) evidence is denied as the court also finds that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or of misleading the jury.
5. Either party may raise this issue of admissibility again at trial should the primary victim's testimony differ at trial from what is currently anticipated based on the 404(b) motion and the information and affidavit filed by the State.
At trial, Jackie Simineo, T.S.'s mother, testified that T.S. has a learning disability and the I.Q. of a first grader. Simineo received legal guardianship of T.S. when T.S. turned eighteen. Although T.S. had lived in Alaska where Simineo resides, T.S. moved to Arkansas after Simineo had purchased a home for her. T.S. was taking care of her daily living needs, and Simineo was visiting in person about every three to six months in addition to regular video chatting. During Simineo's June 2016 visit, T.S. showed her a bite mark, and Simineo observed that T.S.'s behavior had changed. Simineo explained that T.S. now acts afraid that something bad will happen to her again.
Regina Weiner, a licensed psychological examiner, testified that she had evaluated T.S. During the interview, Weiner observed that T.S. operated with a high level of anxiety. T.S.'s I.Q. was assessed at 46 for nonverbal, 43 for verbal, and 42 for full scale. A standard I.Q. is between 85 and 100. Regarding T.S.'s ability to describe an event that she experienced, Weiner indicated *794 that T.S. was able to describe it using her own words and to tell you what happened. However, she may tell it out of order or have some problems explaining how many times something had happened. Weiner further testified that T.S. has characteristics of autism spectrum disorder. In terms of whether T.S. could give reliable testimony, Weiner opined that T.S. was able to talk, able to remember things that had happened to her, and not likely to deliberately lie. However, T.S. may have things confused and may not express herself well using her language skills. Therefore, Weiner opined that one may need to additionally corroborate her statements with other testimony and other forms of evidence.
T.S. testified that she was thirty-two years old at the time of trial. She identified appellant in the courtroom and testified that he had raped her at her home on the night of April 20, 2016. Prior to the rape, appellant had previously visited T.S. alone and had taken her to various locations, including the water department, in his gray car. She indicated that appellant had her hold his mail for him because appellant had previously lived at the home before she had moved there. T.S. additionally recalled a previous incident in which appellant took her to a cabin and showed her a "sex movie." Although appellant encouraged T.S. to touch his penis, T.S. refused and made him take her home. T.S. explained that on the night of the rape appellant had parked his car at her home. She told him to leave; however, appellant had told her that it was his home. T.S. testified that appellant had bitten her on her right breast and dug his fingernails into her left arm. Appellant pinned her over the couch and penetrated her vagina with his fingers and his penis. T.S. also testified that appellant had touched her anus. During the rape, appellant asked T.S. if she liked it and threatened her not to tell anyone of the rape or he would kill her.
Sharon Scheel testified that she lived across the street from T.S. Scheel testified that T.S. was friendly and "mentally challenged." Scheel explained that she felt like she was putting puzzles together during conversations with T.S. Scheel testified that T.S. had seemed upset and told her about a sexual assault that occurred in April 2016. T.S. had also shown her the bite mark that was infected at that time. Scheel additionally had observed some bruises on T.S.'s arms. Although Scheel did not call the police after their conversation, she encouraged T.S. to do so. Finally, Scheel testified that she had seen appellant walking in the area on more than one occasion but stated that she had not personally observed appellant at T.S.'s home.
Donald Jordan testified that he also lived in a home across the street from T.S. Jordan explained that he had gotten to know T.S. since she moved in and has learned to understand her speech better over time. He would also assist her with her yard work. Although T.S. had never told him about the rape prior to law enforcement's investigation, he noticed that her behavior had changed after April 2016. She would not talk to him or answer the door as she usually had. After law enforcement started investigating, T.S. told him about the rape.
Jordan additionally testified that appellant had lived in T.S.'s home before she had moved there. He further testified that he observed appellant alone at T.S.'s home on at least three occasions after T.S. had moved there. On one occasion, appellant approached T.S.'s driveway while Jordan was there. Appellant told Jordan that he was interested in the truck parked in the driveway, and Jordan told him that the truck was not for sale. Appellant further learned on that occasion that T.S. had *795 lived alone. On other occasions, Jordan observed appellant's wife at the home as well. Although he was not certain of the exact date, Jordan observed appellant's car outside T.S.'s home around midnight in April 2016.
Chasity Siratt testified that she previously was employed by the Malvern Police Department as a police-service representative. During her employment, she photographed the alleged bite mark on T.S.'s right breast, and the photographs were admitted into evidence. Officer Jack Seely testified that he was present when T.S. and her mother reported the rape and that his body camera recorded the interview. The video of the interview was played for the jury without objection.
After a break during the trial, an in-chambers conference was held. Defense counsel moved for a mistrial. According to defense counsel, during the break, the prosecutor had commented in front of the jury that he was getting a piece of candy to get his blood sugar up. Defense counsel argued that it was improper for the prosecution to say anything to the jury. The trial court denied the motion for mistrial, and the trial continued.
Sergeant Frazier Ford testified at trial that he was involved in the investigation of T.S.'s allegations. During the investigation, T.S. identified appellant from a group of six photographs. Sergeant Ford further testified that T.S. was able to show him the route that appellant had taken when he drove her to the water department as she had alleged. He additionally testified that one of appellant's cars was either gray or silver.
Mona Simms testified that she is a nurse practitioner and treated T.S. in February 2017 for pain in her shoulder. T.S. indicated that her shoulder had bothered her ever since the rape. Simms explained that T.S. was tearful and upset when explaining her injury and the incident that had caused the injury.
Before the jury heard any of the relevant Rule 404(b) evidence, appellant renewed his previous objection, which the trial court denied. The jury was instructed that the evidence of any other alleged crimes, wrongs, or acts of appellant may not be considered to prove the character of appellant in order to show that he acted in conformity therewith. The jury was further instructed that the evidence was not to be considered to establish a particular character trait that appellant had or to show that he acted similarly on the day of the incident. The jury was told that the evidence was merely offered as evidence of intent, motive, opportunity, preparation, or plan and that it was up to the jury to determine whether any of the other alleged crimes, wrongs, or acts had been committed. Thereafter, C.R., Tommy White, Trooper Kyle Sheldon, Sergeant Frazier Ford, Breanna Turner, Laycon Clark, H.W., and Lieutenant Dorata Delacruz testified consistent with their testimony at the preliminary hearing.
After the State rested, defense counsel moved for a directed verdict, arguing that T.S.'s testimony was unreliable. However, the trial court denied the motion.
Shanah Nolen testified on appellant's behalf. She explained that she had known appellant for twelve years and that they have one child together. Nolen testified that she did not know T.S.; however, she admitted that she and appellant had formerly lived at the address where T.S. was then living. She further admitted that she and appellant had gone to the address twice to collect their mail in April 2016. The second time they went was after T.S. had called her phone. Nolen alleged that on both occasions she had stayed in the car while appellant went to the door to *796 collect the mail. Finally, Nolen testified that neither she nor appellant had been back to the address since those two times.
At the conclusion of the testimony, defense counsel renewed his motion for a directed verdict. The trial court denied the motion. The jury found appellant guilty, and he was sentenced in accordance with its recommendation. This appeal followed.
II. Sufficiency of the Evidence
A motion for a directed verdict is a challenge to the sufficiency of the evidence. Hinton v. State , 2015 Ark. 479, 477 S.W.3d 517. When reviewing a challenge to the sufficiency of the evidence, this court assesses the evidence in the light most favorable to the State and considers only the evidence that supports the verdict. Id. The sufficiency of the evidence is tested to determine whether the verdict is supported by substantial evidence, direct or circumstantial. Wyles v. State , 368 Ark. 646, 249 S.W.3d 782 (2007) ; Boyd v. State , 2016 Ark. App. 407, 500 S.W.3d 772. Substantial evidence is evidence that is of sufficient force and character that will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. Hinton , supra. Finally, the credibility of witnesses is an issue for the jury and not the court. Id. The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. Id.
A person commits rape if he or she engages in sexual intercourse or deviate sexual activity with another person by forcible compulsion. Ark. Code Ann. § 5-14-103(a)(1)(Supp. 2017). "Sexual intercourse" is penetration, however slight, of the labia majora by a penis. Ark. Code Ann. § 5-14-101(11). "Deviate sexual activity" is defined as any act of sexual gratification involving (A) the penetration, however slight, of the anus or mouth of a person by the penis of another person; or (B) the penetration, however slight, of the labia majora or anus of a person by any body member or foreign instrument manipulated by another person. Ark. Code Ann. § 5-14-101(1). "Forcible compulsion" means physical force or a threat, express or implied, of death or physical injury to or kidnapping of any person. Ark. Code Ann. § 5-14-101(2).
Here, T.S. testified that appellant had refused to leave her home, had bitten her on her right breast, dug his fingernails into her left arm, pinned her over the couch, and penetrated her vagina with his fingers and his penis. T.S. also testified that appellant had touched her anus. Moreover, appellant threatened her not to tell anyone of the rape, or he would kill her. A rape victim's uncorroborated testimony describing penetration may constitute substantial evidence to sustain a conviction of rape, even when the victim is a child. Breeden v. State , 2013 Ark. 145, 427 S.W.3d 5. The rape victim's testimony need not be corroborated, and scientific evidence is not required. Id. However, in this case, a neighbor testified that he saw appellant's car at T.S.'s home at midnight sometime in April 2016. Additionally, other witnesses at trial testified that they had observed the bite mark on T.S.'s right breast. Although appellant argues that T.S.'s testimony was unreliable, it is the function of the jury, and not the reviewing court, to evaluate the credibility of witnesses and to resolve any inconsistencies in the evidence. Id. Therefore, substantial evidence supports appellant's conviction, and we affirm on this point.
III. Rule 404(b) Evidence
The State filed a pretrial motion to be allowed to admit testimony regarding two prior alleged rapes of two other *797 victims pursuant to Arkansas Rule of Evidence 404(b). After a hearing, the trial court held that the testimony was admissible because it was used to establish appellant's intent, motive, opportunity, preparation, or plan in the rape of T.S. Additionally, the trial court found that "the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or of misleading the jury." Appellant alleges that this finding was erroneous and that the evidence was admitted merely to show that he was either a criminal or a bad person. We disagree.
The admission or rejection of testimony is a matter within the trial court's sound discretion and will not be reversed on appeal absent a manifest abuse of that discretion and a showing of prejudice to the defendant. Solomon v. State , 2010 Ark. App. 559, 379 S.W.3d 489. An abuse of discretion is a high threshold that does not simply require error in the trial court's decision but requires that the trial court acted improvidently, thoughtlessly, or without due consideration. Harris v. State , 2018 Ark. App. 219, 547 S.W.3d 709.
Arkansas Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Therefore, evidence is not admissible under Rule 404(b) simply to show a prior bad act. Vance v. State , 2011 Ark. 243, 383 S.W.3d 325. Rather, the test for admissibility under Rule 404(b) is whether the evidence is independently relevant, which means it must have a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Id. Any circumstance that links a defendant to the crime or raises a possible motive for the crime is independently relevant and admissible under Rule 404(b). Id.
While evidence of other crimes or bad acts may be admissible under Rule 404(b), to be probative under Rule 403, the prior crime or bad act must be similar to the crime charged. Vance , supra. When offered as Rule 404(b) evidence, the prior bad act need not have the degree of similarity that is required for evidence of modus operandi. Fells v. State , 362 Ark. 77, 207 S.W.3d 498 (2005). The previous acts do not have to be identical, just similar. Solomon , supra. Moreover, our supreme court has stated that we are to give considerable leeway to the trial court in determining whether the circumstances of the prior crimes and the crimes at hand were sufficiently similar to warrant admission under Rule 404(b). See Vance , supra ; Creed v. State , 372 Ark. 221, 273 S.W.3d 494 (2008) ; Sasser v. State , 321 Ark. 438, 902 S.W.2d 773 (1995) ; Harris , supra. With these standards in mind, we cannot say that the trial court's finding that there were enough similarities between the incidents to make the testimony regarding them relevant as evidence of appellant's intent, motive, or plan constituted reversible error.
Additionally, our supreme court has explained that even if evidence is relevant under Rule 404(b), Arkansas Rule of Evidence 403 provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."
*798 However, our supreme court has further noted that evidence offered by the State in a criminal trial is likely to be prejudicial to the defendant to some degree, otherwise it would not be offered. Vance , supra ; Rounsaville v. State , 2009 Ark. 479, 346 S.W.3d 289. Nevertheless, the evidence should not be excluded under Rule 403 unless the defendant can show that the evidence lacks probative value in view of the risk of unfair prejudice. Vance , supra. This court reviews a trial court's ruling under Rule 403 for an abuse of discretion. Id. While the Rule 404(b) evidence here may have been prejudicial, as most Rule 404(b) evidence is, it was also independently relevant to appellant's intent, motive, or plan, and its probative value was not outweighed by the danger of unfair prejudice. Accordingly, we conclude the trial court did not abuse its discretion in admitting the Rule 404(b) evidence.
IV. Motion for Mistrial
Appellant's last contention is that the trial court abused its discretion when it denied his motion for mistrial. Appellant specifically argues that he was entitled to a mistrial after the prosecutor had told the jury that he was going to get a piece of candy to get his blood sugar up during a break in the trial. However, appellant fails to cite any authority to support his contention. The only authority he references is an instruction given to jurors to explain that they must refrain from talking to the attorneys, parties, or witnesses. Here, it was alleged that the prosecutor made a comment to the jurors-not the other way around. A mistrial is a drastic remedy that should be granted only when justice cannot be served by continuing the trial. Green v. State , 2013 Ark. 497, 430 S.W.3d 729. The trial court has the sound discretion to decide whether to grant a mistrial, and this decision will not be overturned absent a showing of abuse or upon manifest prejudice to the complaining party. Id. Here, the alleged comment was not about the case, and appellant has failed to demonstrate any possible prejudice that could have resulted from the comment. As such, we affirm on this point.
V. Sentencing Order
Finally, we note that there is a clerical error in the sentencing order. Appellant was charged as a habitual offender with three prior felony convictions; these convictions were introduced at the sentencing hearing; and the jury sentenced appellant as a habitual offender. Moreover, even appellant acknowledges in his brief on appeal that he is a habitual offender. However, the box that would indicate that appellant was sentenced as a habitual offender is not checked on the judgment. The trial court is free to correct a clerical error to have the judgment speak the truth. Jefferson v. State , 2017 Ark. App. 536, 532 S.W.3d 593. Thus, we affirm appellant's conviction but remand to the trial court with instructions to correct the sentencing order.
Affirmed; remanded to correct the sentencing order.
Gruber, C.J., and Brown, J., agree.